UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAGINAW OFFICE SERVICE, INC.,

       Plaintiff,

                                             Civil Action No. 09-CV-13889

v.

                                             HON. MARK A. GOLDSMITH

BANK OF AMERICA, N.A.,

       Defendant.
_____/

### OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, [DE #30]

**I.   Introduction**

    This is a breach of contract case.  Plaintiff Saginaw Office Services, Inc., a transportation services company, and Defendant Bank of America, N.A. (the "Bank") are parties to a Transportation Services Agreement (the "TSA") (Docket Entry ("DE") 15-2), under which Plaintiff agreed to provide courier services to the Bank.  The TSA was executed on or about October 1, 2001 by Plaintiff and the Bank's predecessor ABN AMRO North America, Inc. ("ABN AMRO"), having an effective date of July 1, 2001.  At the same time the TSA was executed, the original contracting parties executed an addendum to the TSA (the "TSA Addendum" (DE 15-3)) setting out additional contract terms.

    The TSA transportation schedules define the routes and amount of service to be provided. The dispute primarily concerns the Bank's decision to "delete" the transportation schedules to set the service (and payment) level at zero, while leaving the contract technically open.  Secondarily, the parties dispute the obligation of the Bank to pay for certain fuel charges that were billed at

the time the relationship between the parties broke down, years after the charges were allegedly incurred.

Before the Court is the Bank's motion to dismiss, or in the alternative, for summary judgment, on which the Court heard oral argument on February 24, 2011. Because the Court finds that the contract language does not unambiguously support the Bank's interpretation, the Court denies the motion.

## II. Background

The TSA reads, in relevant part:

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and further good and valuable consideration, the receipt and adequacy is hereby acknowledged, the parties agree as follows:

1. <u>Transportation Services</u>. Carrier hereby agrees to provide to Shipper, and Shipper hereby engages that, subject to Shipper's reserved right under Section 2 to reduce the Transportation Schedules, Shipper will hire Carrier to provide transportation services of the following commodities upon the terms contained in this Agreement:

A. Cash letters, canceled checks, and similar instruments, including any and all proof work, consolidation work, corresponding and other documents and paper (but excluding currency and coin and other equivalents to money) associated therewith ("instruments"); and

B. Shipper's intra-company and United States Mail ("Mail"). Shipper will comply with all requirements of the Private Express Statutes of the United States (U.S. Postal Laws and Regulations).

\* \* \*

2. A. <u>Transportation Schedules</u>. Carrier will provide Transportation Services for Instruments and Mail in accordance with the Transportation Schedules referenced in Exhibit A hereto (collectively, the "Transportation Schedules"). Shipper may, at its election, adjust the Transportation Schedules during the term of this Agreement upon thirty (30) days prior written notice to Carrier; provided, however, that any addition to the Transportation

2

> Schedules will be effective only if and when agreed by the Carrier. . .
>
> * * *
>
> 13. <u>Term of Agreement</u>. The initial term of this Agreement shall be two (2) years commencing July 1, 2001, and will be automatically renewed in absence of a ninety (90) day prior written notice from either party to the other. . .

TSA §§ 1, 2, 13.

On or about October 1, 2007, the Bank purchased certain assets of ABN AMRO and became a party to the TSA with the express acknowledgement of Plaintiff. The Bank desired to end its relationship with Plaintiff and made arrangements to transfer the work to another company. Delmaster Dep. (DE 28-9) at 96-97; Rosenberry Dep. (DE 28-8) at 90. In March 2009, the Bank sent a request to another servicing company seeking a bid for the work Plaintiff was performing. Rosenberry Dep. (DE 28-8) at 81-82. The Bank approved that carrier's bid and, on May 15, 2009, representatives of the Bank contacted Plaintiff's president, Cynthia Schwab, to inform her of the Bank's decision to terminate its agreement with Plaintiff. Cox Dep. (DE 28-7) at 56. The Bank's representatives conveyed to Plaintiff that they believed the TSA could be terminated at any time on 90 days' notice. Cox Dep. (DE 28-7) at 100-105. Schwab responded that the contract automatically renewed every two years (originally commencing on July 1, 2001), unless 90 days' written notice was given. As the Bank had not provided written notice by April 1, 2009, the contract had already renewed for another two-year period and would now expire July 1, 2011. Schwab Dep. (DE 28-5) at 111-113; Cox Dep. (DE 28-7) at 113-115.

The Bank then decided to reduce the transportation schedules to zero, while leaving the contract open. In doing so, it relied on Section 2 of the TSA, which states, "[s]hipper may, at its election, adjust the Transportation Schedules during the term of this Agreement upon thirty (30)

3

days prior written notice to the Carrier." A representative of the Bank discussed this option with Schwab on May 26, 2009. Rosenberry Dep. (DE 28-8) at 21-27. Schwab asserted that as long as the Bank continued its routes within the contract territory, the Bank was contractually obligated to engage Plaintiff to operate those routes. May 27, 2009 Email (DE 28-11). Nevertheless, on July 23, 2009, the Bank sent Plaintiff a letter stating that (i) the Bank intended to let the TSA expire effective July 1, 2011, and that (ii) the Bank was immediately electing to "delete all Transportation Schedules under the Agreement effective August 24, 2009." July 23, 2009 Letter (DE 15-4).

The Bank introduced Plaintiff to the new carrier, R. R. Donnelley, for the purposes of R. R. Donnelly's potentially engaging Plaintiff as a subcontractor (which did not materialize). Cox Dep. (DE 28-7) at 71-77. The Bank communicated to Plaintiff that it was agreeing to pay "[a]t our discretion" one extra month of service, concluding October 23, 2009, in the event that Plaintiff did not continue as a subcontractor for R. R. Donnelley. July 23, 2009 Letter (DE 15-4). The Bank terms this extra month's payment a "courtesy" payment. Bank's Br. (DE 28) at 10. Since that time the Bank has received no services from Plaintiff and has made no payments to Plaintiff.

In November 2009, Plaintiff sent the Bank invoices for fuel surcharges for twenty-one months between September 2003 and May 2005, which had never previously been billed. According to Plaintiff's email,

> [t]he Contract between SOS Express and Bank of America provides for fuel surcharges. And it has come to our attention that in this matter there are several months you were not invoiced for these contractual charges. Attached are invoices for the months not charged and the appropriate applicable amounts.

November 23, 2009 Email (DE 15-5). These charges amounted to $88,975.16, which the Bank has not paid.

On January 7, 2010, Plaintiff filed suit against the Bank, seeking damages for the monthly service fee until the expiration of the contract on July 1, 2011 and for the unpaid fuel surcharges. Amended Compl. (DE 15) at 7-8. The Bank has moved to dismiss, or in the alternative, for summary judgment in its favor, on the grounds that the contract language unambiguously allows the Bank to delete the transportation schedules and bars recovery for the fuel surcharges.

### III. Discussion

The Bank has filed this motion both as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and alternatively as a motion for summary judgment under Rule 56. A defendant's motion to dismiss will be granted only if the plaintiff fails to state a claim upon which relief may be granted, with all well-pleaded facts in the complaint accepted as true and construed in the light most favorable to plaintiff. League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007). In evaluating a defendant's summary judgment motion, a court considers the evidence presented in determining whether the plaintiff has raised a genuine issue of material fact, with facts and inferences construed in the light most favorable to the plaintiff. Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 373 (6th Cir. 2009) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

#### a. Deletion of Transportation Schedules

The Bank argues that, as a matter of law, the TSA is unambiguous in granting the Bank an unqualified right to adjust the schedules downward, even to zero. Plaintiff's contrary position is that the Bank's ability to adjust the schedules downward is limited to objective justifications for such adjustment, such as a bank closing. Schwab Dep. (DE 28-5) at 45. Having thoroughly reviewed the contract language and for the reasons discussed more fully below, the Court denies

the Bank's motion because the Court does not find that the disputed TSA provisions unambiguously compel the Bank's interpretation.

This action involves common law breach-of-contract claims. Because the Court's jurisdiction in this matter is based on diversity of citizenship pursuant to 28 U.S.C. § 1332, it applies Michigan law to Plaintiff's claims. Charvat v. GVN Michigan, Inc., 561 F.3d 623 (6th Cir. 2009). Under Michigan law, "unambiguous contracts are not open to judicial construction and must be enforced as written." Rory v. Continental Life Ins. Co., 703 N.W.2d 23, 30 (Mich. 2005). Whether a contract is ambiguous is a question of law to be decided by the court. Royal Prop. Group, LLC v. Prime Ins. Syndicate, Inc., 706 N.W.2d 426, 431 (Mich. Ct. App. 2005). A contract is ambiguous "only if its language is reasonably susceptible to more than one interpretation." Gortney v. Norfolk & W. Ry. Co., 549 N.W.2d 612, 615 (Mich. App. 1996) (internal citations omitted). A term is not ambiguous merely because the parties advocate for divergent meanings. Henderson v. State Farm Fire & Cas. Co., 596 N.W.2d 190, 194 (Mich. 1999). If a court finds that a contract term is ambiguous, its interpretation must be decided by the jury, which may consider relevant extrinsic evidence. Klapp v. United Ins. Group Agency, Inc., N.W.2d 447, 453-454 (Mich. 2003).

The Bank argues that the contract is not ambiguous. The TSA states that obligations of the agreement are "subject to Shipper's reserved right under Section 2 to reduce the Transportation schedules," and Section 2 of the TSA in turn provides that the shipper may adjust the schedules upon 30 days' written notice. Only additions to schedules requires carrier approval, per Section 2, which reads:

> . . . any addition to the Transportation Schedules will be effective only if and when agreed to by Carrier. Each addition or deletion to the Transportation Schedules will result in as a corresponding addition to or reduction of, the monthly fee established in Section 4. . .

6

TSA § 2(A).[1]

Because the TSA does not describe a minimum level of service or limitations on the adjustment provided for in Section 2, the Bank argues that the agreement unambiguously allows for the deletion of the schedules to reduce the service level to zero. Plaintiff, on the other hand, points to dictionary definitions of "reduce" and "adjust," which it argues would not encompass the deletion of schedules in their entirety.

In determining whether the words "reduce" and "adjust" are ambiguous, the Court is directed to consider the ordinary meanings of the words, Rory, 703 N.W.2d at 28, and to harmonize the disputed terms with other parts of the contract, Royal, 706 N.W.2d at 432 ("construction should be avoided that would render any part of the contract surplusage or nugatory"). "When determining the common, ordinary meaning of a word or phrase, consulting a dictionary is appropriate." Stanton v. City of Battle Creek, 647 N.W.2d 508 (Mich. 2002). The Court finds that the plain meanings of these terms do not unambiguously support the Bank's position.

The dictionary definition of "adjust" is to "adapt" or "to bring to a more satisfactory state." Webster's Third New Int'l Dictionary 27 (2002) ("Webster's"). This is a fairly broad definition, which may be subject to, alternatively, narrower or more expansive scope. To say that the complete elimination of a schedule brings it to a more satisfactory state is undoubtedly an expansive view of adjustment. It is the Court's duty to determine the intent of the contracting parties from the language of the contract itself, Rory, 703 N.W.2d at 30 ("the intent of the contracting parties is best discerned by the language actually used in the contract"), and in this

---

[1] This language demonstrates that "addition" refers to additional service, not additional terms to the schedules (which could refer to either reductions to or increases in service).

case, it cannot unambiguously be said that the sense in which the parties used these terms embraces the Bank's more expansive definition. Likewise, "reduce" means "to diminish in size, amount, extent, or number," Webster's, at 1905, but the term does not, in the context of the TSA, unambiguously embody an expansive scope that views complete deletion as a subset of diminution.

Furthermore, other parts of the TSA undermine the Bank's position and support Plaintiff's position that the contracting parties took a narrower view of the disputed contract language. Specifically, the termination provision in Section 13 of the TSA provides for two-year terms that are automatically renewed in the absence of written notice 90 days prior to term renewal. The Bank itself called attention to this provision as evidence that the entire contract was fairly negotiated by both parties. Bank's Br. (DE 28) at 5-6. As the Bank notes, its standard termination provision used when contracting with third parties is different from that found in the agreement with Plaintiff: the Bank's standard contract terms allow for termination on 30 days' notice and do not provide for a two-year renewal, while Section 13 of the TSA was specifically negotiated to be advantageous to Plaintiff. Id. This advantage, however, does not exist if the Bank can effectively accomplish a termination by deleting the schedules on 30 days' notice without adhering to Section 13. This section is, therefore, inconsistent with the Bank's theory that it may delete the transportation schedules on 30 days' notice as a legal alternative to terminating the agreement. The Bank's interpretation would render "nugatory" Section 13, a violation of a cardinal rule of contract interpretation. Royal, 706 N.W.2d at 432.[2]

---

[2] The Bank argues that the provisions governing schedule reductions and the provisions governing contract termination serve distinct purposes, but it does not explain what those purposes might be. Bank's Br. (DE 28) at 13.

The Court thus concludes that Plaintiff has stated a plausible claim for breach of contract, and that there is a genuine issue of material fact to be determined by a jury regarding the scope of the terms of the TSA relating to the ability of the Bank to adjust the transportation schedules.[3]

### b. Fuel Surcharges

After the effective termination of the relationship between the parties, Plaintiff sent the Bank invoices for outstanding fuel surcharges for twenty-one months between September 2003 and May 2005, which had never previously been billed. The Bank has refused to pay these charges, relying on a provision found in the October 1, 2001 TSA Addendum:

> Under no circumstances shall ABN AMRO be liable for any consequential, exemplary, incidental or punitive damages under the Agreement, even if ABN AMRO has been advised of the possibility of such damages. ABN AMRO's liability under the Agreement shall be limited to the amounts paid thereunder.

TSA Addendum, ¶ 9.

According to the Bank, this provision "limits any recovery by Plaintiff to whatever amount has been prepaid." Bank's Br. (DE 28) at 18. Because the previous month had no fee once the Bank deleted the schedules, according to the Bank, "the Addendum denied Plaintiff any

---

[3] In rejecting the Bank's reading, the Court does not express an opinion on Plaintiff's contrary position that the Bank is bound in an exclusive agreement to use Plaintiff's courier services for all its transportation needs within the region serviced by Plaintiff. The Court limits its finding to the determination that the TSA does not unambiguously allow the Bank to delete all transportation schedules. Similarly, the Court does not intimate whether the TSA should be construed as a requirements contract, as the Bank suggests it should. A requirements contract is one "in which the seller promises to supply all the specific goods or services which the buyer may need . . . in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller." Acemco, Inc. v. Olympic Steel Lafayette, Inc., 2005 WL 2810716, at *8 (Mich. Ct. App. Oct. 27, 2005). The Court notes that under Michigan law, even a requirements contract may not guarantee exclusivity. See GRM Corp. v. Miniature Precision Components, Inc., 2008 WL 82224, at *5 (E.D. Mich. Jan. 8, 2008) ("Michigan law is not well settled as to whether a requirements contract must be exclusive."). Both parties will be free to argue their respective positions on these issues to the jury.

further recovery."[4]  Id.  Plaintiff disagrees with the Bank's interpretation of the provision's limitation on liability, arguing that the Bank's reading renders the provision unconscionable. Plaintiff's Response Br. (DE 34) at 12-14.  Instead, Plaintiff interprets the provision to foreclose recovery for incidental or consequential damages.  Id.

The Court cannot determine, as a matter of law, whether the TSA Addendum unambiguously supports the Bank's interpretation.  The Bank's limitation of the phrase "the amounts paid thereunder" to refer only to amounts prepaid is not necessitated by the plain meaning of the words.  The dictionary definition of "paid" is "that has been or will be paid for." Webster's at 1620 (emphasis added).  Thus the Bank's reading is not the only reasonable reading of the provision because one could reasonably conclude that the term "the amounts paid thereunder" refers to the contract price, regardless of whether that amount has been prepaid. Based on this definition, an alternative reasonable interpretation could be as follows: after the TSA Addendum enumerates what the Bank is not liable for (i.e., consequential, exemplary, incidental or punitive damages), the TSA Addendum continues by reciting what the Bank is liable for, which is the payable amount agreed upon, regardless of prepayment.  Further support that Plaintiff's view of the TSA addendum is reasonable is that under the Bank's reading, the Bank avoids all liability for breach if it simply fails to pay for services rendered because under its view, liability is limited to amounts prepaid.

Finally, the Bank asserts that it overpaid Plaintiff when it sent Plaintiff the August "courtesy" payment, which it argues should cover Plaintiff's claim on the fuel surcharges. Bank's Reply Br. (DE 38) at 5.  The Bank has not explained the significance of this payment or

---

[4] The Bank contends that this same argument also bars any recovery for breach arising from the deletion of the schedules.  Bank's Br. (DE 28) at 17-18.

why this payment should be used to satisfy Plaintiff's claim and not be viewed as gratuitous. The Court will not consider issues "adverted to in a perfunctory matter. . . . It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." United States v. Sandridge, 385 F.3d 1032, 1035 (6th Cir. 2004) (internal quotations omitted).

### IV. Conclusion

For the foregoing reasons, the motion to dismiss, or in the alternative, for summary judgment [DE #30], is denied.

s/Mark A. Goldsmith<br>
MARK A. GOLDSMITH<br>
United States District Judge

Dated:  March 30, 2011

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 30, 2011.

s/Deborah J. Goltz<br>
DEBORAH J. GOLTZ<br>
Case Manager